UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| ROUNDTABLE TECHNOLOGY INC., )<br>)<br>Plaintiff,        )<br>)<br>v.                 )<br>)<br>DIRIGO TECHNOLOGY LLC,    )<br>NICHOLAS KNOWLTON, and    )<br>ISRAEL ROY,              )<br>)<br>Defendants.       ) | No. 2:22-cv-00130-LEW |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION**

This matter comes before the court on a motion by Plaintiff, Roundtable Technology Inc., to temporarily restrain or preliminarily enjoin Defendants from using any of Plaintiff's proprietary information that Defendants might possess. Because I find that preliminary injunctive relief is not warranted, I deny Plaintiff's motion.

**BACKGROUND**

Plaintiff, RoundTable Technology Inc. ("RTT"), is a Managed Services Provider ("MSP") that focuses on providing information technology ("IT") services for nonprofit organizations. Defendant Dirigo Technology LLC ("Dirigo") is an MSP that provides IT support to small business and nonprofit organizations. Defendants Knowlton and Roy are former employees of Plaintiff who worked as Plaintiff's Vice President of Business Development and as a support engineer, respectively.

Defendant Knowlton began working as RTT's Vice President of Business

Development in 2016 after over a decade working as an IT professional in Maine. In this role, he oversaw, and appears personally to have managed the acquisition of new clients for RTT. Many of Knowlton's client contacts were made on his personal cellphone, and RTT provided him a stipend to subsidize his monthly phone bill in lieu of providing a business phone. Knowlton did not sign a noncompetition agreement as a condition of his employment, though the record suggests that he was aware that RTT's Employee Manual forbade the unauthorized disclosure of RTT's confidential business records.

In August 2021, Knowlton informed RTT leadership that he intended to leave the company and start his own MSP company, which news RTT leadership then shared with other employees at the company. Knowlton agreed to stay on as an employee for an additional few weeks until September 2021. During this time, Knowlton accessed certain information regarding RTT clients, although the parties disagree about what material Knowlton accessed, the significance of that material, and whether Knowlton subsequently made use of it. Before Knowlton was set to depart the company, RTT leadership asked him to sign agreements related to his departure and a proposed ongoing partnership between RTT and Knowlton's new firm, which agreements included a non-competition provision. However, Knowlton refused to sign the agreements. Following his resignation from RTT, Knowlton founded Dirigo. Knowlton shared news of his new company over social media.

Roy began working in IT support for RTT in 2014. Like Knowlton, Roy used his personal cell phone to contact clients during his time at RTT. Also like Knowlton, Roy was aware of the Employee Manual during his time at RTT, but did not sign a noncompetition agreement with RTT. Unlike Knowlton, however, Roy signed a Confidentiality Agreement

with RTT which forbade him from "disclos[ing] to anyone . . . any information gained . . . in the course of [his] services to [RTT] that relates to the identify of clients." *See* Compl. Ex. 6 at 1 (ECF No. 1-6). The record shows that Knowlton knew Roy during their time as colleagues at RTT and was aware that Roy might be interested in leaving RTT, but the record does not suggest that Roy was involved in Knowlton's plans to found Dirigo. Knowlton ultimately offered Roy a position at Dirigo in November 2021, which Roy accepted. Roy announced his resignation from RTT the next day.

Following Knowlton's and Roy's departures from RTT, both men continued to communicate sporadically with their former colleagues at RTT, often on work-related matters. Though these conversations could have been efforts to gain insight from or poach current RTT employees, they equally could have been friendly correspondences or good-faith efforts to assist former colleagues in what were once shared business endeavors.

Defendants' prior work at RTT appears to have helped them obtain clients for Dirigo. For example, it appears that Defendants have had access to some of Plaintiff's confidential business information—such as client passwords, pricing structures, and attorney work product—since Knowlton and Roy left RTT. However, Plaintiff has not demonstrated that Defendants have made use of that information, and innocent explanations exists for how Defendants gained access to the information at issue. Defendants acknowledge that Dirigo has accepted work from multiple former RTT clients with whom Dirigo was connected based on Knowlton's and Roy's work at RTT. Dirigo has also accepted work from clients to whom RTT had pitched its services but who declined to hire RTT, though there is insufficient evidence to conclude that Knowlton or Roy

attempted in any way to sabotage RTT's pitches to these clients.

Based on this ostensibly impermissible competition, Plaintiff filed suit in this court, alleging that Defendants' business dealings with former clients of Plaintiff's amounted to a breach of contract, breach of fiduciary duty, and misappropriation of trade secrets in violation of the Maine Uniform Trade Secrets Act. Plaintiff seeks damages for these alleged violations as well as injunctive relief that would bar Defendants from soliciting business from Plaintiff's clients, using administrative passwords associated with Plaintiff's clients, and contacting Plaintiff's employees. Plaintiffs now move for a permanent injunction to halt Defendants' allegedly impermissible activities for the pendency of this litigation.

## DISCUSSION

A preliminary injunction will issue only on a showing that (1) the plaintiff is likely to succeed on the merits of a claim for which injunctive relief is available; (2) there is a significant risk of irreparable harm if the injunction is withheld; (3) the balance of the equities favors the issuance of an injunction; and (4) the requested relief will not harm the public interest. *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020). As the party seeking relief, Plaintiff necessarily bears the burden of establishing that the factors favor the award of a preliminary injunction. *See Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 119–20 (1st Cir. 2011).

Here, I need not address all four factors governing the issuance of injunctive relief, because Plaintiff has not shown the requisite threat of irreparable injury. A showing of likely irreparable injury generally "constitutes a necessary threshold showing for an award

of preliminary injunctive relief," and injunctive relief is unwarranted where a Plaintiff fails to make such a showing. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

In the context of a preliminary injunction or temporary restraining order, an irreparable injury is one which "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). In general, economic harms "do not rise to the level of being irreparable" because "traditional economic damages can be remedied by compensatory awards." *NACM-New England, Inc. v. Nat'l Ass'n of Credit Mgmt., Inc.*, 927 F.3d 1, 5 (1st Cir. 2019) (citation omitted). For this reason, courts generally do not award preliminary injunctive relief based solely on a claim that a defendant illegitimately has deprived the plaintiff of its profits. *See, e.g.*, *RF Techs. Corp. v. Applied Microwave Techs., Inc.*, 369 F. Supp. 2d 17, 23 (D. Me. 2005) ("The Court is satisfied that should Plaintiffs prevail on the unfair competition claim, economic damages will be the appropriate remedy.").

There are some instances in which alleged impermissible solicitation, use of confidential information, or other illegitimate business practices may warrant preliminary injunctive relief. For instance, where the threatened economic harm "is so great as to threaten the existence of the movant's business," injunctive relief is appropriate to ensure the business' survival during the pendency of litigation. *NACM-New England, Inc.*, 927 F.3d at 5. Injunctive relief is also appropriate where a plaintiff stands permanently to lose its "good will, customer contacts, and referral sources," because these interests "cannot be

measured in numerical or monetary terms." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 192 (D. Me.), *amended*, 390 F. Supp. 2d 44 (D. Me. 2005) (cleaned up). Ultimately, the touchstone is whether a plaintiff will be made whole by a future monetary award.

The harms complained of in this case likely can be remedied in full by a monetary award. The gravamen of Plaintiff's complaint is that Defendants impermissibly have poached Plaintiff's customers and thereby deprived Plaintiff of profits it otherwise would have stood to gain. Plaintiff does not claim that this competition poses an existential threat to RTT. And even if Defendants have made use of Plaintiff's good will or client contacts, there is no indication that Defendants' actions threaten permanent damage to Plaintiff's present or future business relationships. Should Plaintiff ultimately prevail in its claims against Defendants while also demonstrating the inadequacy of a damages award, then permanent injunctive relief can restore the proper balance between the two MSPs concerning specific clients. Accordingly, Plaintiff's motion fails at the threshold, and preliminary injunctive relief is unwarranted.

## CONCLUSION

Plaintiff's Motion for Preliminary Injunction (ECF No. 9) is **DENIED**.

**SO ORDERED.**

Dated this 18th day of August, 2022.

                                                /s/ Lance E. Walker
                                                UNITED STATES DISTRICT JUDGE